Slip Op. 22-73

## UNITED STATES COURT OF INTERNATIONAL TRADE

PRIMESOURCE BUILDING
PRODUCTS, INC.,
                                        Plaintiffs,

        and

CHENG CH INTERNATIONAL CO.,
LTD., CHINA STAPLE ENTERPRISE
CORPORATION, DE FASTENERS
INC., HOYI PLUS CO., LTD.,
LIANG CHYUAN INDUSTRIAL CO.,
LTD., TRIM INTERNATIONAL INC.,
UJL INDUSTRIES CO., LTD., YU CHI
HARDWARE CO., LTD., AND ZON
MON CO., LTD.,
                                        Consolidated-Plaintiffs,

                v.

UNITED STATES,
                                        Defendant,

        and

MID CONTINENT STEEL & WIRE
INC.,
                                        Defendant-Intervenor.

Before: Mark A. Barnett, Chief Judge
Consol. Court No. 20-03911

## <u>OPINION</u>

[Sustaining Commerce's use of the expected method in its calculation of the non-selected respondents' rate in this antidumping duty review of certain steel nails from Taiwan.]

Dated: June 16, 2022

<u>Bryan P. Cenko</u>, Mowry & Grimson, PLLC, of Washington, DC, argued for Plaintiff. With him on the brief were <u>Jeffrey S. Grimson</u>, <u>Jill A. Cramer</u>, and <u>Wenhui (Flora) Ji</u>.

Consol. Court No. 20-03911                                              Page 2


Kelly Slater, Appleton Luff Pte Ltd., of Washington, DC, argued for Consolidated Plaintiffs.  With her on the brief was Edmund Sim.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Vania Y. Wang, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon, The Bristol Group PLLC, of Washington, DC, argued for Defendant-Intervenor.  With him on the brief were Jennifer M. Smith, Ping Gong, and Lauren N. Fraid.

      Barnett, Chief Judge:  This consolidated action is before the court on two motions

for judgment on the agency record pursuant to U.S. Court of International Trade ("CIT")

Rule 56.2 challenging certain aspects of the final results issued by the U.S. Department

of Commerce ("Commerce" or "the agency") in its review of the antidumping duty

("ADD") order covering certain steel nails from Taiwan.  *See Certain Steel Nails From*

*Taiwan*, 85 Fed. Reg. 76,014 (Dep't Commerce Nov. 27, 2020) (final results of

antidumping duty admin. review and final determination of no shipments; 2018-2019)

("*Final Results*"), and accompanying Issues and Decision Mem., A-583-854 (Nov. 20,

2020) ("I&D Mem."), ECF No. 17-5;[1] *see also* Rule 56.2 Mot. for J. Upon the Agency R.

on Behalf of Pl. PrimeSource Building Prods., Inc., ECF No. 25, and accompanying

Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. on Behalf of Pl.

---

[1] The administrative record associated with the underlying proceeding is contained in a Public Administrative Record ("PR"), ECF No. 17-2, and a Confidential Administrative Record ("CR"), ECF No. 17-3.  PrimeSource submitted joint appendices containing all record documents cited in the Parties' respective Rule 56.2 briefs.  *See* Public J.A. ("PJA"), ECF No. 31; Confidential J.A., ECF No. 30 ("CJA").

PrimeSource Building Prods., Inc., ("PrimeSource's MJAR"), ECF No. 25-2; Rule 56.2

Mot. for J. Upon the Agency R. on Behalf of Consol. Pls., and accompanying Mem. of P.

& A. in Supp. of Consol. Pls.' Rule 56.2 Mot. for J. Upon the Agency R. ("Consol. Pls.'

MJAR"), ECF No. 24.

 Specifically, Plaintiff PrimeSource Building Products, Inc. ("PrimeSource") and

Consolidated Plaintiffs Cheng Ch International Co., Ltd., China Staple Enterprise

Corporation, De Fasteners Inc., Hoyi Plus Co., Ltd., Liang Chyuan Industrial Co., Ltd.,

Trim International Inc., UJL Industries Co., Ltd., Yu Chi Hardware Co., Ltd., and Zon

Mon Co., Ltd., (together with PrimeSource, "Plaintiffs") challenge the review-specific

rate received by the companies not selected by Commerce for individual examination in

this review (referred to herein as the "non-selected respondents' rate").  *See*

PrimeSource's MJAR at 13–42; Consol. Pls.' MJAR at 2–6.  Plaintiffs request remand to

the agency for the determination of a new rate to be applied to the non-selected

respondents.  *See* PrimeSource's MJAR at 42–43; Consol. Pls.' MJAR at 6.  Defendant

United States ("the Government") and Defendant-Intervenor Mid Continent Steel & Wire

Inc. ("Mid Continent") urge the court to sustain the *Final Results*.  Def.'s Resp. to Pls.'

Mots. for J. Upon the Agency R. (Def.'s Resp.") at 23, ECF No. 26; Def.-Int. Mid

Continent Steel & Wire, Inc.'s Resp. Br. ("Def.-Int.'s Resp.) at 17, ECF No. 27.

 As will be discussed in detail below, while the rates assigned to the mandatory

respondents (i.e., the selected respondents) were determined based on adverse facts

available ("AFA"), Commerce is not barred from using those rates to determine the non-

selected respondents' rate.  As such, resolution of this case in part turns on whether the

mandatory respondents may be considered representative of the non-selected

respondents.  In evaluating this issue, the court considers whether the burden lies on

Commerce to affirmatively find that the expected method results in a rate reasonably

reflective of the potential dumping margins of the non-selected respondents, or on

Plaintiffs to demonstrate that Commerce must depart from the expected method.  The

court concludes that the burden is on the party seeking a departure from the expected

method, in this case, Plaintiffs, and finds that Commerce's reliance on the expected

method is otherwise supported by substantial evidence and in accordance with law.

Consequently, the court sustains Commerce's use of the expected method in

calculating the rate for non-selected respondents.

BACKGROUND

On July 25, 2014, Commerce initiated an antidumping duty investigation of

certain steel nails from various countries.  *See Certain Steel Nails From India, the*

*Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey,*

*and the Socialist Republic of Vietnam*, 79 Fed. Reg. 36,019 (Dep't Commerce June 25,

2014) (initiation of less-than-fair-value investigations).  Following affirmative

determinations by Commerce and the U.S. International Trade Commission, Commerce

issued an antidumping duty order on certain steel nails from Taiwan.  *See Certain Steel*

*Nails From the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the*

*Socialist Republic of Vietnam*, 80 Fed. Reg. 39,994 (Dep't Commerce July 13, 2015).

On September 9, 2019, Commerce initiated the fourth administrative review of

the antidumping duty order covering steel nails from Taiwan.  *See Initiation of*

*Antidumping and Countervailing Duty Admin. Review*, 84 Fed. Reg. 47,242, 47,247

(Dep't Commerce Sept. 9, 2019).  For this review, Commerce selected two mandatory

respondents for individual examination: Bonuts Hardware Logistics Co., LLC ("Bonuts")

and Create Trading Co., Ltd. ("Create"), the two respondent companies that accounted

for the largest volume of subject merchandise from Taiwan during the period of review.[2]

*See* I&D Mem. at 9.  Commerce issued questionnaires to Bonuts on October 23, 2019,

and to Create on October 28, 2019.  *Certain Steel Nails From Taiwan*, 85 Fed. Reg.

19,138, 19,138 (Dep't Commerce April 6, 2020) (prelim. results of antidumping duty

admin. review and prelim. determination of no shipments; 2018–2019) ("*Prelim.*

*Results*"), and accompanying decision mem. ("Prelim. Mem.") at 2, PR 55, PJA Tab 12.

Bonuts did not respond.  *See* Prelim. Mem. at 2.  Create submitted a letter indicating

that it had no reviewable sales during the relevant period such that it was not required to

respond to the questionnaire.  *Id.* at 2 n.10.  Commerce accordingly "excused" Create

from responding to the questionnaire and selected another respondent to individually

examine.  *Id.* at 2.

To replace Create, Commerce selected Pro-Team Coil Nail Enterprise, Inc.

("Pro-Team"), the next-largest respondent exporter by volume, as a new mandatory

respondent.  *See id.* at 2–3.  Pro-Team submitted a letter indicating that it would not

respond to the questionnaire.  *See id.* at 3.

---

[2] 19 U.S.C. § 1677f-1(c)(2) (2018) permits Commerce to select the largest exporters by
volume for individual examination when it is "not practicable" for Commerce to
determine individual margins for each exporter.  These selected exporters are referred
to as the "mandatory" respondents.  *See* I&D Mem. at 9.

On February 3, 2020, after the statutory deadlines to participate as a voluntary respondent passed, Liang Chyuan, a non-selected respondent exporter of subject merchandise, submitted respondent selection comments to Commerce and indicated that it was "willing and able to submit a response to [Commerce's ADD] questionnaire in this segment of the proceeding."  I&D Mem. at 20 & n.109 (citations omitted).  Liang Chyuan did not, however, submit questionnaire responses.  *See id.*  Liang Chyuan requested that Commerce use Liang Chyuan's data from the 2017-2018 administrative review or the non-selected respondents' rate from a prior review to determine Liang Chyuan's rate.  *Id.* at 19.

Commerce assigned both mandatory respondents preliminary dumping margins of 78.17 percent using AFA due to their failure to respond to the questionnaires.[3] *Prelim. Results*, 85 Fed. Reg. at 19,139; Prelim. Mem. at 7–9.  Commerce also found that Liang Chyuan's asserted willingness to submit questionnaire responses was insufficient for it to be chosen as a mandatory respondent because "it [was] not the next largest exporter of subject merchandise" and because its asserted "willingness is not a consideration" pursuant to the statutory scheme "unless [the] company has . . . fulfilled all the statutory and regulatory criteria for consideration" as a voluntary respondent.  Prelim. Mem. at 3–4.  Commerce found that Liang Chyuan had not taken the necessary steps to qualify as a voluntary respondent.  *Id.* at 4.  Commerce further explained that

---

[3] AFA rates, as established in the statute, may be determined based on data from the petition, other information placed on the record, or determinations in a prior segment of the proceeding regarding the subject merchandise.  19 U.S.C. § 1677e(b)(2) (2018).

carrying forward a previous review rate for Liang Chyuan was "not a feasible or legally sanctioned methodology."  *Id.*

Commerce used the so-called "expected method" to determine preliminarily the rate applicable to the non-selected respondents: averaging the rates assigned to the mandatory respondents.[4]  *See id.* at 10.  This method yielded a 78.17 percent rate for the non-selected respondents, including Liang Chyuan.  *Prelim. Results*, 85 Fed. Reg. at 19,139.  The rates assigned to the mandatory respondents and the non-selected respondents' rate remained the same in the *Final Results*.  85 Fed. Reg. at 76,015.

Before the court, Plaintiffs challenge Commerce's use of the expected method to determine the non-selected respondents' rate.  Plaintiffs argue that because the mandatory respondents' rates were based on AFA, the expected method does not yield results reasonably reflective of the potential dumping margins of the non-selected respondents.  PrimeSource's MJAR at 13–35; Consol. Pls.' MJAR at 3.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[5] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

---

[4] Commerce refers to its method, throughout the preliminary and final I&D Memoranda, as the "expected method."  See I&D Mem.  In one instance, Commerce refers to the use of a "simple-average" rather than weighted-average.  *Id.* at 10.  In this case, the result is the same and this one reference does not affect the court's analysis.
[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless stated otherwise.

## DISCUSSION

At issue first is whether Commerce's use of the expected method based on the mandatory respondents' AFA rates to determine the rate to apply to the non-selected respondents was based on substantial evidence and otherwise in accordance with law. Second, the court examines whether Liang Chyuan was entitled to an individually calculated rate.

### I.    Use of the Expected Method for Determining the Non-Selected Respondents' Rate was Lawful

The statute is silent regarding how to determine the rate for companies not selected for individual examination in an administrative review.  In such a situation, Commerce looks to 19 U.S.C. § 1673d(c)(5) for guidance, which provides instructions for determining the "all-others rate" in an investigation.[6]  *See, e.g.*, *Albemarle Corp. v. United States*, 821 F.3d 1345, 1352 & n.6 (Fed. Cir. 2016); *see also* I&D Mem. at 10 (discussing 19 U.S.C. § 1673d(c)(5)).  Section 1673d(c)(5)(A) provides that the all-others rate assigned to non-examined companies is calculated as the "weighted average of the estimated weighted average dumping margins" assigned to individually

---

[6] In nonmarket-economy cases, companies may obtain a "separate rate" by establishing independence from government control.  *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1373–74 (Fed. Cir. 2013); *Bosun Tools Co. v. United States*, No. 2021-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) (unpublished).  When numerous companies seek separate rates, Commerce will likewise select mandatory respondents and determine a non-selected respondents' rate for those respondents that have established their independence from government control.  *See Bestpak*, 716 F.3d at 1374.  Jurisprudence for determining the rate applicable to non-selected, separate rate respondents is relevant to determining non-selected respondents' rates in a market-economy proceeding.  *See id.* at 1373–74 (discussing the market-economy rule alongside the nonmarket-economy rule); *Bosun*, 2022 WL 94172 at *2–3 & n.2 (same).

examined companies, "excluding any zero and *de minimis* margins, and any margins determined entirely under section 1677e of this title [i.e., on the basis of the facts available, including AFA]."  19 U.S.C. § 1673d(c)(5)(A).

When the dumping margins assigned to all individually examined companies are zero, *de minimis*, or based on facts available, the statute further provides that Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated."  *Id.* § 1673d(c)(5)(B).

The Statement of Administrative Action accompanying the Uruguay Round Agreements Act, which Congress has approved as an authoritative interpretation of the statute, *id.* § 3512(d), provides an "expected method" to determine the all-others rate in these situations, Uruguay Rounds Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 ("SAA").  When the dumping margins for all individually investigated exporters and producers are determined entirely on the basis of facts available or are zero or *de minimis*, "[t]he expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available."  *Id.*  The SAA further provides that "if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods."  *Id.*

Prior litigation surrounding these statutory provisions and corresponding portions of the SAA provides the backdrop to the court's consideration of this case.  First, case law confirms that when Commerce relies on 19 U.S.C. § 1677f-1(c)(2) to select the largest exporters by volume for individual examination, it does so based on a statutorily supported assumption that the data from the largest exporters may be viewed as representative of all exporters.  *See Albemarle*, 821 F.3d at 1353; *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017).  This respondent selection exercise occurs early in the administrative proceeding before questionnaires are issued and is based on the respondents' export volumes, not the results of the agency's dumping margin analysis.  *See* Respondent Selection Mem. (Oct. 22, 2019) at 4–5, CR 5, PR 29, CJA Tab 2.  In other words, the selected respondents are assumed to be representative of the non-selected respondents without regard to whether their final antidumping duty margin is zero, *de minimis*, based entirely on the use of AFA, or calculated based on the questionnaire responses of the selected respondents.  *See Albemarle*, 821 F.3d at 1353; *Bosun*, 2022 WL 94172 at *4.

Second, this assumption of representativeness that arises with Commerce's reliance on 19 U.S.C. § 1677f-1(c)(2) carries weight when Commerce determines the rate applicable to non-selected respondents.  As mentioned above, Commerce determines the rate for non-selected respondents consistent with 19 U.S.C. § 1673d(c)(5).  Thus, in the first instance, Commerce will weight-average the above-*de minimis* calculated rates to determine the non-selected respondent rate.  19 U.S.C. § 1673d(c)(5)(A).  If, however, the rates for all selected respondents are zero, *de*

*minimis*, or based on facts available, the SAA provides that the expected method is for

Commerce to weight-average such rates to determine the non-selected respondents'

rate.  SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4201.  In other words, it is

*expected* that zero, *de minimis*, and facts available rates will be used in determining the

non-selected respondents' rate.  *See id.*; *Bosun*, 2022 WL 94172, at *4 (rejecting the

appellants' argument that Commerce unreasonably based the separate rate, in part, on

an AFA rate as "expressly foreclosed by statute").

     *Albemarle* and *Changzhou Hawd* confirm that the expected method is the default

method and that the burden of proof lies with the party seeking to depart from the

expected method (or with Commerce as the case may be).  For example, in *Albemarle*,

Commerce sought to deviate from the expected method when the mandatory

respondents were both found to have *de minimis* margins.  *See Albemarle*, 821 F.3d at

1353.  Instead of weight-averaging those results, Commerce decided to "carry[] forward"

the results of prior administrative reviews to determine the rate for non-selected

respondents.  *Id.*  In reviewing that determination, the U.S. Court of Appeals for the

Federal Circuit ("Federal Circuit") held that "[t]he burden is not on the separate

respondents to show that their dumping is the same as that of the individually examined

respondents.  Rather, Commerce must find based on substantial evidence that there is

a reasonable basis for concluding that the separate respondents' dumping is different."

*Id.*

     The *Albemarle* court outlined two circumstances under which Commerce may

depart from the expected methodology and carry forward a prior rate for any particular

respondent.  First, the court found that Commerce needed some contemporaneous data to establish that the market and margins relevant to the subject merchandise had not changed such that the prior rates could be considered reflective of current rates.  *Id.* at 1357.  Second, in the AFA context, "where Commerce is allowed to consider deterrence as a factor," the court found that "Commerce may presume that 'a prior dumping margin imposed against an exporter in an earlier administrative review continues to be valid if the exporter fails to cooperate in a subsequent review.'"  *Id.* at 1357–58 (quoting *KYD, Inc. v. United States*, 607 F.3d 760, 767 (Fed. Cir. 2010); citing *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339–40 (Fed. Cir. 2002)).  The court further stated that it has "upheld this presumption because 'if it were not so, the [exporter], knowing the rule, would have produced *current* information showing the margins to be less.'"  *Id.* at 1358 (quoting *KYD*, 607 F.3d at 766).  Other than in these two circumstances, "[t]here is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period," thus reinforcing the notion that the expected method is the default.  *Id.* at 1356.

One year after the court's decision in *Albemarle*, the Federal Circuit again confirmed the relevance of the assumed representativeness of the mandatory respondents in *Changzhou Hawd*.  *See Changzhou Hawd*, 848 F.3d at 1012 ("The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters.").  There, the court again found that in order to depart from the expected method, Commerce must identify substantial evidence that the non-selected

respondents' dumping was different from that of the mandatory respondents.  *See id.*
("[T]he presumption of representativeness may be overcome . . . [with] 'substantial
evidence that there is a reasonable basis for concluding that the separate respondents'
dumping is different.'") (quoting *Albemarle*, 821 F.3d at 1353).

Recently, in *Bosun*, the Federal Circuit confirmed that the representativeness of
the selected respondents is independent of the results of Commerce's dumping margin
analysis.[7]  *See* 2022 WL 94172, at *4.  In the review underlying *Bosun*, Commerce
selected the two largest respondents for examination and calculated a *de minimis*
dumping margin for one respondent while basing the other respondent's rate on AFA.
*Id.* at *2–3.  Commerce determined the rate for the non-selected respondents by finding
the simple average of these two rates.[8]  *See id.* at *3.  The *Bosun* court affirmed
Commerce's inclusion of the AFA-based rate in the average assigned to the non-
selected respondents.  *See id.* at *4.  In so doing, the court recalled its discussion in
*Albemarle* regarding the "general assumption underlying the statutory framework"—
specifically, the assumption that data from the largest volume exporters may be viewed

---

[7] Although *Bosun* is an unpublished opinion, as discussed herein, this court finds the
opinion helpful to its analysis because the reasoning is consistent with and builds on the
Federal Circuit's prior reasoning in *Albemarle* and *Changzhou Hawd* and is otherwise
persuasive.

[8] By using the simple average, Commerce diverged from the expected method, which
calls for using the weighted average of the selected respondents' rates.  SAA at 873,
*reprinted in* 1994 U.S.C.C.A.N. at 4201.  Commerce may have used a simple average
of the two respondents' rates (in other words, giving equal weight to each rate) in order
to avoid revealing the actual volume of imports into the United States by the cooperating
respondent if such information was considered business proprietary.  Regardless, the
Federal Circuit did not fault Commerce's use of a simple average.

as representative of all exporters, *id.* (quoting Albemarle, 821 F.3d at 1353)—and went

on to find that "although *Albemarle* concerned a case with *de minimis* rates rather than

AFA rates, its reasoning is equally applicable here; the same statutory language in

[section] 1673d(c)(5)(B) that permits use of *de minimis* rates also permits use of AFA

rates,"[9] *id.* (emphasis added).

These cases all recognize an important assumption that is built into Commerce's

statutory authority to engage in respondent selection: that the largest exporters by

volume are assumed to be representative of the non-selected respondents.  Consistent

with this assumption, the cases also stand for the proposition that Commerce is

expected to use the mandatory respondents' rates to determine the antidumping duty

rate to be assigned to the non-selected respondents.

These concepts, representativeness and expectedness, are connected.

Representativeness allows Commerce to select certain respondents for individual

examination and, in so doing, decline to individually examine other respondents.  By

allowing Commerce to focus its resources on certain respondents, the statute

---

[9] Plaintiffs repeatedly cite *Yangzhou Bestpak*, 716 F.3d 1370, to support their assertion that Commerce must demonstrate that the rate yielded by the expected method reasonably reflects the potential dumping margins of the non-selected respondents. *See* PrimeSource's MJAR at 7, 11–12.  However, *Bosun* interprets *Bestpak*'s holding narrowly, emphasizing that *Bestpak*, which addressed a challenge to the results of an antidumping duty investigation, "simply found that Commerce's methodology was unreasonable 'as applied,' given the lack of data."  2022 WL 94172, at *4.  In this case, as in *Bosun*, Commerce examined the existing data from prior administrative reviews and found that the record evidence did not support a finding that the expected method did not produce a rate that reasonably reflected the potential dumping of the non-selected respondents.  *See infra*, pp. 18–21.

necessarily creates the assumption of representativeness because Commerce often will

lack further information about the non-selected respondents.  *See Albemarle*, 821 F.3d

at 1353.  Commerce is not otherwise required to collect information about the non-

selected respondents because Commerce is permitted, in fact, expected, to treat the

mandatory respondents as representative of the non-selected respondents when it

determines the non-selected respondents' rate.[10]

     This assumption of representativeness, combined with the expectation that

Commerce will treat the mandatory respondents as representative of the non-selected

respondents, provides a basis for understanding that part of the SAA language upon

which PrimeSource focuses: "[I]f [the expected] method is not feasible, or if it results in

an average that would not be reasonably reflective of potential dumping margins for

non-[examined] exporters or producers, Commerce may use other reasonable

---

[10] Plaintiffs argue that, despite all this, AFA rates are still impermissible for use in the
expected method because they cannot be representative of current non-selected
respondents' rates.  PrimeSource's MJAR at 14–21.  However, Plaintiffs fail to establish
that the use of AFA to determine the mandatory respondents' rates in any way detracts
from the presumption of representativeness.  While Plaintiffs seek to differentiate the
use of AFA rates in the expected method from the use of *de minimis* or zero rates by
characterizing AFA rates as "punitive," the Federal Circuit has found that AFA rates may
be representative of actual dumping because, "if it were not so, the [mandatory
respondent], knowing the rule, would have produced *current* information showing the
margin to be less."  *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed.
Cir. 1990).  Moreover, the absence of any opposition to the use of AFA in this review by
a mandatory respondent suggests that the AFA rates assigned to the mandatory
respondents were probative of their dumping—further justifying these rates as
representative.  *See id.  Bosun* also clearly resolves this issue in the context of the
expected method: AFA rates are permissible in calculating the rate applied to the non-
selected respondents.  *Bosun*, 2022 WL 94172, at *4 (finding that AFA rates are
acceptable inputs to the expected method for calculating all-others rates).

methods."  SAA at 873, *reprinted in* 1994 U.S.C.C.A.N. at 4201.  PrimeSource suggests that this language places an affirmative burden on Commerce to find, based on substantial evidence, that the expected method produces a rate that *is* reasonably reflective of the potential dumping by non-selected respondents.  *See* PrimeSource's MJAR at 16.  The court finds that the statute, SAA, and relevant opinions of the Federal Circuit do not support placing such a burden on Commerce.

As discussed above, the statute clearly permits Commerce to engage in a respondent selection process pursuant to 19 U.S.C. § 1677f-1(c) when certain conditions have been met.  Commerce engaged in that process in this administrative review and no party challenges that decision.  Having determined to examine the largest exporters by volume in this review, the statute permits Commerce to proceed with the review without requiring additional information from the non-selected respondents.  *See, e.g.*, *Changzhou Hawd*, 848 F.3d at 1012 (discussing the statutory authority to select respondents rather than examining every exporter).  Thus, interpreting the SAA to require Commerce to nevertheless engage in a data collection exercise with the non-selected respondents in order to determine their "potential dumping margins" would be inconsistent with the language of 19 U.S.C. § 1677f-1(c) expressly permitting Commerce to "limit[] its examination" to the largest exporters and producers by volume.  19 U.S.C. § 1677f-1(c)(2).  Such an interpretation would defeat the purpose of the respondent selection process.  Nothing in the statute, SAA, or jurisprudence suggests that such a burden exists.

To the contrary, the courts have long recognized that the burden of establishing relevant facts may properly be assigned to the party in control of the information necessary to establish those facts.  *See, e.g.*, *Rhone Poulenc*, 899 F.2d at 1190–91 (placing "the burden of production on the [party] which has in its possession the information capable of rebutting the agency's inference").  In this case, the non-selected respondents are in control of the information that would establish whether applying the expected method based on the rates of the mandatory respondents would not reasonably reflect the potential dumping margins of those non-selected respondents. Thus, the court finds that the non-selected respondents bear the burden of providing evidence that the results of the expected method would not reasonably reflect the potential dumping margins of the non-selected respondents.

Accordingly, the court turns to whether Plaintiffs have provided substantial evidence to rebut the presumption of representativeness and thereby justify deviating from the expected method.  Commerce found that the "expected method is reasonable here because the record evidence does not rebut the presumption that the mandatory respondents are representative."  I&D Mem. at 9.  While Plaintiffs argue that substantial evidence rebutted the presumption of representativeness, PrimeSource's MJAR at 13–34; Consol. Pl.'s MJAR at 3–5, Plaintiffs point to no evidence from this period of review to support their assertion that the expected method result was not reasonably reflective of their actual margins, *see* PrimeSource's MJAR at 27–34 (arguing that AFA rates are punitive and that past reviews yielded rates that were more reflective of current rates). Here, all respondents were aware of the AFA rate from prior reviews that would likely be

utilized in the case of non-participation by one or more mandatory respondents and its

potential inclusion in the determination of the non-selected respondents' rate.  *See* I&D

Mem. at 14–15.  Nevertheless, no non-selected respondent provided a timely voluntary

questionnaire response or timely evidence that the mandatory respondents were in any

way not representative of the remaining respondents (such as operating in a different

market segment ("commodity" versus "high-end niche") or other evidence that might

provide the agency with cause to question the representativeness of the mandatory

respondents).  Moreover, there is not sufficient evidence to indicate that the prior, lower

rates to which Plaintiffs point are more reflective of current rates than the rate

determined by the expected method.

     *Bosun* offers some considerations for evaluating Commerce's analysis of the

rates from prior reviews.  In *Bosun*, as plaintiffs do here, the appellant argued that the

rate applied to the non-selected respondents diverged from a "trend" of prior low rates.

2022 WL 94172, at *5.  The Federal Circuit considered the individual rates determined

for the appellant in the past and found that they were above *de minimis* and, in fact,

trending upwards; it found Commerce's decision to weigh the most recent rate most

heavily to be reasonable; and it acknowledged Commerce's consideration and rejection

of earlier prior rates that, because they were lower, arguably detracted from the rate

assigned to Bosun.  *See id.* at *5–6.

     Here, Commerce rejected Plaintiffs' suggestion of a pattern of lower rates,

instead finding a history of AFA usage in previous reviews.  *See* I&D Mem. at 14–15.

While the non-selected respondents asserted that "calculated margins ranged from zero

percent to 27.69 percent, which [respondents] consider to be 'low' margins," *id.* at 14,

Commerce noted that the respondents "omitted any mention of the rates assigned in the

history of the proceeding that were based on the 78.17 percent AFA rate," whereas

Commerce found that "more than half of the reviews contained [a] determination[] based

on" AFA, *id.* at 14.  Thus, for Commerce, there was no evidence that the 78.17 percent

margins had less probative value than the so-called "low" rates to which respondents

pointed.  *See id.* at 14–15.  As Commerce's analysis highlights, examining only the

calculated margins and excluding from consideration the AFA-based margins would not

have yielded a full picture of the historical trends.

Commerce also did not ignore the previous antidumping rates.  Commerce

explained that past rates have been inconsistent from review to review, and that "if there

is any pattern from segment-to-segment of the behavior of examined respondents, that

pattern demonstrates that, most of the time, the mandatory respondents have failed to

cooperate and have been assigned a rate based on AFA."  *Id.* at 14.  Commerce relied

on this assessment to find that there was no basis on which to find that past calculated

rates are representative, because there was fluctuation from review to review.  *See id.*

at 14–15.  For example, Commerce pointed to the fact that Pro-Team, a mandatory

respondent in this and the previous review, received an AFA rate in this review but a

calculated rate in the preceding review.  *Id.* at 14.  Similarly, Unicatch Industrial Co., Ltd.

("Unicatch"), "another frequent mandatory respondent" that was not under individual

review here, was assigned rates of 6.16 percent and 27.69 percent in subsequent

reviews—an increase of 350 percent from one review to the next.  *Id.* at 15.  Moreover,

Bonuts received AFA rates in the first, second, and fourth administrative reviews.  *Id.* at

14. The table below demonstrates this lack of consistency—and the lack of consistently

"low" rates—in frequent mandatory respondents' rates over the course of the reviews:[11]

|               | Pro-Team    | Bonuts  | Unicatch |
|---------------|-------------|---------|----------|
| Investigation | 2.16%[12]   |         |          |
| POR1          |             | 78.17%  | 78.17%   |
| POR2          | 0%          | 78.17%  | 6.16%    |
| POR3          | 6.72%[13]   |         | 27.69%   |
| POR4          | 78.17%      | 78.17%  |          |

These values support Commerce's conclusion that the rates fluctuated

significantly from review to review and, thus, that looking to past reviews for evidence of

current dumping lacks a logical foundation.  Absent any consistency from review to

review, Plaintiffs' arguments in favor of using rates from past reviews are unconvincing.

Commerce's determination not to use past rates was therefore reasonable.

Commerce also noted that in each segment of this proceeding, the mandatory

respondents' rates have formed the basis for any non-selected respondents' rate.  *Id.* at

15.  Moreover, "73 of 75 of the non-examined companies have never been examined in

any segment of the proceeding," and "there is no evidence on this record or any other

record that the 78.17 percent rate does not reflect their commercial reality."  *Id.*  In other

---

[11] These values, unless otherwise indicated, are extracted from the analysis in the I&D Memorandum on pages 14 and 15.

[12] *Certain Steel Nails From Taiwan*, 82 Fed. Reg. 55,090, 55,090 (Dep't Commerce Nov. 20, 2017) (notice of court decision not in harmony with final determination in less than fair value investigation and notice of amend. final determination).

[13] *Certain Steel Nails From Taiwan*, 85 Fed. Reg. 14,635, 14,636 (Dep't Commerce Mar. 13, 2020) (final results of antidumping duty admin. review and determination of no shipments; 2017–2018).

words, the relevant data from past reviews was severely limited. *See id.* Commerce

found that Plaintiffs presented no compelling argument for why such limited, non-

contemporaneous data would be more representative than margins determined in the

present review. *See id.*

      The above analysis indicates that Commerce's use of the expected method was

supported by substantial evidence and in accordance with the law.  As required by the

substantial evidence standard, Commerce engaged with the data from past reviews and

considered its relevance to the present review, finding that the lack of consistency in

prior rates made past review data unusable for determining present rates.  Commerce

examined whether prior rates might be representative of current dumping rates, and it

found that there was insufficient evidence on the record to rebut the presumed

representativeness of the mandatory respondents' rates from this review.  Thus,

Plaintiffs' arguments in favor of carrying forward prior rates as a preferable method are

unpersuasive.  Accordingly, the court sustains Commerce's determination of the non-

selected respondents' rate based on the expected method.

    **II.**    **Liang Chyuan Is Not Entitled to Different Status**

      PrimeSource attempts to distinguish Liang Chyuan from the other non-selected

respondents in two ways: first, by noting that Liang Chyuan was "willing and able to

submit a response," and, second, that Liang Chyuan had been a respondent in a

previous review and received a lower rate.  PrimeSource's MJAR at 26.

      The Government asserts that Liang Chyuan's cooperation in one prior review is

"not sufficient evidence to divert from the expected method and apply [Liang Chyuan's]

rate from the prior review, particularly given the fluctuating rates of Pro-Team and Unicatch, which have both received AFA in certain segments but not others." Def.'s Resp. at 19 (citing I&D Mem. at 19); *see also* Def.-Int.'s Resp. at 10.  Further, the Government asserts that Liang Chyuan's willingness to submit a questionnaire response does not by itself entitle it to an individual rate because it did not participate as a voluntary respondent.  *See* Def.'s Resp. at 19; *see also* Def.-Int.'s Resp. at 10.

PrimeSource fails to distinguish Liang Chyuan from the other non-selected respondents.  Non-selected respondent rates are often applied to multiple non-selected respondents—indeed, that is the purpose of these rates.  *See Bosun*, 2022 WL 94172, at *2 ("After Commerce determines the rates for the mandatory respondents, it then assigns a separate rate to the nonindividually examined respondents . . . .").  Non-selected respondents, as a general matter, are not entitled to individually determined rates; however, they may qualify as voluntary respondents and thereby receive individually determined rates if they provide necessary information in a timely fashion. *See* 19 U.S.C. § 1677m(a)(1)(A)(i).

To qualify as a voluntary respondent, a company must respond to the same questionnaire issued to the mandatory respondents within the same timeframe.  19 U.S.C. § 1677m(a)(1)(A)(i).  Liang Chyuan did not do so.  I&D Mem. at 20. PrimeSource attempts to analogize Liang Chyuan's status to that of a voluntary respondent simply because Liang Chyuan expressed a willingness to submit responses to the questionnaire.  PrimeSource's MJAR at 26.  However, Liang Chyuan was not required to request or await Commerce's approval to file a timely voluntary response.

*See* 19 U.S.C. § 1677m(a)(1)(A)(i).  Moreover, Liang Chyuan did not express its

willingness to participate until February 3, 2020, roughly two months after the deadlines

for the mandatory respondents to respond to the agency's questionnaires.  I&D Mem. at

20 & nn.109–10.

> While Liang Chyuan participated as a respondent in one prior review in which it
received a calculated margin based on its sales during that period of review, *see id.* at
19, that fact does not entitle Liang Chyuan to retain that calculated rate in the present
review.  As Commerce noted, "each administrative review is a separate segment of
proceedings with its own unique facts."  *Id.* at 19 n.103 (quoting *Shandong Huarong
Mach. Co. v. United States*, 29 CIT 484, 491 (2005)).  In addition, "there is no record
evidence substantiating [Liang Chyuan's] claim that it would have received the same
result in this review as it did in a previous review, had it been selected for individual
examination."  *Id.* at 20.  In sum, Commerce was justified in finding that Liang Chyuan
was not entitled to an individual rate because Liang Chyuan did not take the necessary
steps to qualify for an individual rate or otherwise establish that the non-selected
respondent rate should not apply.

### CONCLUSION

> Based on the foregoing, the court will sustain Commerce's *Final Results*.
Judgment will enter accordingly.

/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: June 16, 2022
       New York, New York